# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 8425 | **DATE** | 8/30/2000 |
| **CASE TITLE** | Glink, et al. vs. Media Adventures, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing held and continued to 9/27/2000 at 10:00 A.M.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: The Court will award plaintiffs a total of $323,933.70 in damages. The Court will dismiss without prejudice Counts Seven and Eight of plaintiffs' complaint. Plaintiffs' motion for entry of default judgment [43-1] is granted in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | AUG 3 1 2000 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | ED-7 FILED FOR DOCKETING | docketing deputy initials | 52 |
| | Copy to judge/magistrate judge. | 00 AUG 30 PM 5: 46 | | |
| | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice | |
| | | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ILYCE GLINK and THINK GLINK, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 98 C 8425 |
| | ) | |
| MEDIA ADVENTURES, INC. and BRAD SAUL, | ) | Magistrate Judge Nan R. Nolan |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Ilyce Glink and Think Glink, Inc. sue defendants Media Adventures, Inc. and Brad Saul for copyright infringement, fraud, and breach of contract in the above captioned case. On April 11, 2000, the court ordered defendants to comply with discovery rules and previous orders of the court. On May 3, 2000, the court found that a default judgment was proper given defendants' continuing failure to comply with discovery rules, and plaintiffs were ordered to itemize their damages. The issues relating to plaintiffs' damages are now fully briefed and the court is called upon to enter its default judgment. For the reasons set forth below, the court will award plaintiffs a total of **$323,933.70** in damages as itemized below. In addition, the court will dismiss without prejudice Counts Seven and Eight of plaintiffs' complaint.

DOCKETED

AUG 31 2000

## FACTS

The following facts are taken from plaintiffs' complaint, all of which are deemed true due to defendants' default. See FMC Corp. v. Varomos, 892 F.2d 1308, 1310 (7th Cir. 1990). Plaintiffs Ilyce Glink and Think Glink, Inc. (collectively referred to hereinafter as "Glink") entered into three

52

oral agreements with defendants Media Adventures, Inc. and Brad Saul, the founder, president, secretary, and sole shareholder of Media Adventures, Inc. (collectively referred to hereinafter as "Media").[1] In the first agreement, Glink created and hosted 52 two-hour radio programs designed as a weekly series entitled "Century 21 Real Estate USA" (the "Century 21 programs"). Complaint ¶¶ 6-8. Glink retained ownership of the name and content of the programs, while Media was granted exclusive distribution rights in exchange for its promise to promote the programs; provide production and distribution facilities; secure advertisers; place the programs on radio stations nationwide; bill and collect revenues; pay all legitimate expenses; account to Glink monthly for all revenues and expenses; and equally divide all profits with Glink quarterly. Id. ¶ 7. The Century 21 programs were broadcast by more than 63 stations nationwide between January 1997 and December 1997. Id. ¶ 8. However, Media did not account to Glink for the revenues and expenses of the Century 21 programs and never distributed any profits to Glink. Id. ¶ 9.

In May 1997, while the Century 21 programs were being created, Glink and Media entered into their second oral agreement for the licensing of another series of syndicated radio programs. Id. ¶ 10. This series of programs, called "The Countrywide Real Estate Minute," ultimately consisted of 260 one-minute programs created by Glink between June 1997 and May 1998 (the "Countrywide programs"). Id. ¶ 12. Again Glink retained ownership of the name and content of the programs and Media was granted exclusive distribution rights for the programs. Again Media promised to account to Glink for all revenues and expenses and to divide all profits with Glink quarterly. Id. ¶ 11. The Countrywide programs were broadcast by approximately 90 stations

---

[1] This case is stayed with respect to Brad Saul, who has filed for bankruptcy, and the present order is therefore applicable to Media Adventures, Inc. only.

2

nationwide between July 1997 and July 1998. Id. ¶ 12. However, Media did not account to Glink for the revenues and expenses of the Countrywide programs and never distributed any profits to Glink. Id. ¶ 13. In October 1998, after several previous demands, Glink demanded payment from Media and was told that Media had temporarily diverted Glink's share of profits to other aspects of Media's business. Id. ¶ 13.

In February 1998, before Glink learned of Media's "temporary diversion" of profits owed to Glink, Glink and Media entered into a third oral agreement for the licensing of another series of syndicated radio programs. Id. ¶ 14. This series of programs, sponsored by Home & Garden Radio Network, ultimately consisted of 25 two-hour programs created by Glink between April 1998 and September 1998 (the "Home & Garden programs"). Id. ¶¶ 16-17. Again Glink retained ownership of the name and content of the programs and Media was granted exclusive distribution rights. Again Media promised to account to Glink monthly for all revenues and expenses and to divide all profits with Glink quarterly. Id. ¶ 15.

Media knew at the time of the third agreement that profits from Glink's programs would be diverted to other aspects of Media's business and would not be paid to Glink. Id. ¶ 38. Media induced Glink to create the Home & Garden programs by falsely representing: (1) that the accounting for the Countrywide programs was not yet prepared but was forthcoming; (2) that the profits from the Countrywide programs were not yet distributed because Media was awaiting affidavits from radio stations certifying that the programs had actually been broadcast; (3) that the sponsor of the Countrywide programs would not pay Media until Media obtained the affidavits; (4) that the profits from the Countrywide programs were not yet available; (5) that accountings for the Home & Garden series would be provided monthly; and (6) that profits for the Home & Garden

3

series would be paid quarterly. Id. ¶ 38. These representations were made with the intent to deceive Glink, and Glink relied on them in entering into the third oral agreement with Media.. Id. ¶¶ 39-40.

Despite repeated demands, Media did not account to Glink for the revenues and expenses of the Home & Garden programs and never distributed any profits to Glink. Id. ¶ 19. On October 14, 1998, Glink terminated the third agreement due to Media's failure to pay Glink 50% of the programs' profits, and due to Glink's belief that Media was diverting profits to other aspects of its business. Id. ¶ 20. Glink further notified Media on October 14, 1998 that its right to "broadcast, rebroadcast, distribute, copy or disseminate" any of the Home & Garden programs was terminated. Id. Nevertheless, Media distributed four Home & Garden programs between October 14 and November 11, 1998. Id. ¶ 21. Each of these four programs was broadcast by at least 20 radio stations. Id. On November 11, 1998, Glink again notified Media that Media's right to distribute Glink's programs had been terminated, and informed Media that any further distribution of the programs would constitute a willful infringement of Glink's copyright. Id. ¶ 22. Nevertheless, Media distributed four more Home & Garden programs between November 11 and December 11, 1998. Id. ¶ 23. Each of these four programs was broadcast by at least 20 radio stations. Id. On November 19, 1998, Glink applied for copyright registration of nineteen Home & Garden programs, including the eight programs distributed by Media after Glink's termination of the third agreement. Id. ¶ 24.

## STANDARD OF REVIEW

Upon the default of the defendant, the well-pleaded facts alleged in the complaint (relating to liability) are taken as true. FMC Corp. v. Varomos, 892 F.2d 1308, 1310 (7th Cir. 1990). In fixing an award of damages, however, the court must not simply accept the plaintiff's statement of

4

damages, but must find reasonable support for the damages in the record or at a hearing. Merrill Lynch Mortg. Corp. v. Narayan, 908 F.2d 246, 253 (7th Cir. 1990); Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997). In the present case, neither party has requested a hearing and the court finds that none is needed due to the reasonably accurate evidence of damages already in the record. Accordingly, the court reviews this evidence, all of which came from Glink, to determine the appropriate amount of damages to be awarded in this case.

## ANALYSIS

The court has jurisdiction over Count One of plaintiffs' complaint under 28 U.S.C. § 1331, and has supplemental jurisdiction over the remaining counts of plaintiffs' complaint under 28 U.S.C. § 1367(a). The Copyright Act governs plaintiffs' claim of copyright violations. 17 U.S.C. § 501, *et seq.* Illinois law applies to plaintiffs' state-law claims. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).

### I. Count One: Copyright Infringement

The court finds that Count One properly alleges eight incidents of copyright infringement. A prima facie case of copyright infringement consists of the following elements: (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original. Feist Publs., Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). Media belatedly argues that Glink cannot make out a case of infringement because Glink has not proven that Media's licenses were revocable. A similar argument was made and rejected in Lulirama Ltd., Inc. v. Axcess Broadcast Servs., 128 F.3d 872, 883 (5th Cir. 1997). The Lulirama court found that the validity and application of a licensing agreement was an affirmative defense that the defendant was required to prove: "[E]stablishing the absence of a license is not an element of proof required to state a prima facie

claim of copyright infringement." Id. In the present case, the complaint as a whole clearly states that Glink maintained ownership of the content of the programs throughout the relevant events, that Glink lawfully registered copyrights for all the materials at issue, that Media wrongfully breached its licensing agreement with Glink, and that Glink properly terminated the agreement and notified Media that its right to distribute the programs was terminated as of October 14, 1998. Media has given up, through default, any right to challenge its liability for copyright infringement in this case.

As for damages, Glink requests statutory damages in the amount of $100,000 per infringement, nearly the maximum allowed for a willful infringement under 17 U.S.C. § 504(c). A willful infringement of copyright is found where the infringer "knows that its conduct is an infringement" or acts "in reckless disregard of the copyright owner's right." Wildlife Express Corp. v. Carol Wright Sales, 18 F.3d 502, 511 (7th Cir. 1994) (quotation omitted). Willfulness may be found where the alleged infringements occurred after the infringer received notice of its violation. Id. (failure to stop infringing acts or to seek advice of attorney after notice of infringement may show willfulness); Video Views, Inc. v. Studio 21, 925 F.2d 1010, 1021 (7th Cir. 1991) ("[E]vidence that notice has been accorded to the alleged infringer before the specific acts found to have constituted infringement occurred is perhaps the most persuasive evidence of willfulness."). A letter informing the defendant that his conduct may constitute infringement clearly provides notice to the defendant. Wildlife Express, 18 F.3d at 511.

The court agrees with Glink that the facts in this case support a finding of willfulness, because Glink's letters (prior to the eight infringements at issue) clearly notified Media that its license had been revoked and that further distribution of Glink's programs was prohibited. Glink's second letter even stated that any further distribution would constitute *willful infringement*. In

addition, Media was aware, through repeated complaints and demands from Glink, that Glink was owed her share of profits under the licensing agreement. One cannot expect to continue violating an agreement while at the same time reaping the benefits of that agreement for an indefinite period of time. Accordingly, Glink properly classifies Media's infringements as willful infringements, and the court is authorized under the Copyright Act to award damages up to $150,000 for each infringement. 17 U.S.C. § 504(c)(2).

Having established that the infringement was willful, the court must then determine the appropriate amount of damages. Glink has requested $100,000 per infringement. A statutory damages award should consider the profits earned by the infringer, and should seek to both penalize the infringer and discourage other infringers. Tallyrand Music, Inc. v. Charlie Club, Inc., 930 F.2d 1224 (7th Cir. 1991) (willful infringement after license expired justified award of $40,000—three times the amount that should have been paid to renew license); Fitzgerald Publ. Co. v. Baylor Publ. Co., 807 F.2d 1110, 1117 (2d Cir. 1986) (the benefit of the infringement must be taken away from the infringer; court should consider expenses saved and profits earned by infringer); Rodgers v. Eighty Four Lumber Co., 617 F. Supp. 1021 (W.D. Pa. 1985) (willful infringement for months after notice justified award of $122,500—approximately $44,000 more than the amount that should have been paid for license); Milene Music, Inc. v. Gotauco, 551 F. Supp. 1288 (D. R.I. 1983) (deliberate disregard of copyright justified award of $5,000 for eight infringing performances--$2,000 more than the amount that should have been paid for license).

The first factor the court considers is Media's profits from Glink's programs. Glink has shown that the total profits for *all 25* Home and Garden programs was roughly $60,000 (roughly $30,000 worth of profits for each party). There is no evidence of Media's specific profit for each

7

of the eight infringing programs. However, the court believes that $60,000 can be used as a rough benchmark in considering the proper award of damages. If $60,000 is divided by 25, the total profit for each program was approximately $2400. The court concludes that $2400 per infringement is not sufficient to punish Media and deter future infringers.

A review of the case law on statutory damages for willful infringement reveals a wide variance in awards. The courts recognize several aggravating factors that have been used to escalate awards along the statutory continuum. First, an infringement that takes place after a preliminary injunction has issued may increase the culpability of the infringer and justify a higher award. Playboy Enters. V. Webbworld Inc., 991 F. Supp. 543 (N.D. Tex. 1997) ($1,000 for each of 29 infringements prior to preliminary injunction; $20,000 for each of 5 willful infringements after preliminary injunction). Second, an infringement that takes place after a history of unpaid license fees or other evidence of the infringer's complete disregard for the rights of the copyright holder may justify a higher award. United Features Syndicate, Inc. v. Spree, Inc., 600 F. Supp. 1242 (E.D. Mich. 1984) (four previous successful lawsuits against infringer for similar infringements considered in awarding $50,000 for each of two infringements); Lauratex Textile Corp. v. Allton Knitting Mills, Inc., 517 F. Supp. 900 (S.D.N.Y. 1981) (deliberate pattern of repeated infringements considered to escalate damages); Boz Scaggs Music v. KND Corp., 491 F. Supp. 908 (D.C. Conn. 1980) (unpaid fees accumulated on license considered along with the license's expiration). Third, an infringement that takes place through the counterfeiting or alteration of the copyrighted property may justify a higher award. Cable/Home Communication Corp. v. Network Prods., Inc., 902 F.2d 829 (11th Cir. 1990) ($451,789 awarded for illegal promotion of pirated chips for descrambling satellite transmissions of pay TV); RSO Records, Inc. v. Peri, 596 F. Supp. 849 (S.D.N.Y. 1984) ($50,000

8

per infringement awarded for large-scale counterfeiting of records, tapes, and graphics).

In the present case, Media initially ignored Glink's notice of termination, but did not defy a court order in distributing the eight programs. In addition, Media did not counterfeit or alter Glink's programs in any way—they were distributed intact (including copyright announcements). The court further stresses that Media's infringing conduct ceased after a very short period of time and involved a very small number of distributions, unlike other cases involving radio or TV broadcasts. See, e.g., MCA TV Ltd. v. Feltner, 89 F.3d 766 (11th Cir. 1996) (900 infringing broadcasts). However, the eight infringements at issue occurred after Media engaged in a lengthy pattern of withholding Glink's share of profits and lying about it. This pattern justifies an enhanced award of statutory damages. For all of these reasons, the court sets Glink's statutory award at $8,000 per infringement, for a total of **$64,000**.

Glink further requests reasonable attorneys' fees under 17 U.S.C. § 505. Glink's attorney supports the request for fees with an affidavit and detailed records of his time spent on Glink's case. Media generally challenges the reasonableness of Glink's request, but the court finds nothing inherently unreasonable about it. Media specifically challenges several records, but the court need not address these complaints because Glink's attorney has agreed to forego the challenged fees. Accordingly, attorneys' fees are awarded to Glink in the amount of **$21,588.91**.

## II. Count Two: Conversion

Count Two is an alternative theory for recovery for the unauthorized broadcasts of Glink's programs alleged in Count One, and the damages awarded under Count One fully compensate Glink for the misconduct alleged in Count Two. Accordingly, no damages will be awarded for Count Two.

### III. Counts Four and Five: Breach of the First and Second Agreements

The court finds that Counts Four and Five properly allege breaches of contract under Illinois law, and Media does not dispute this fact.[2] Glink requests actual damages under these counts in the amounts of $83,154 for Count Four (the Century 21 programs) and $134,936 for Count Five (the Countrywide programs). Glink supports these awards through the affidavit and report of Glink's expert accountant, Mark Jason ("Jason"). Media does not dispute that Glink should receive actual damages, but does question Jason's calculation of overhead expenses. The court generally favors Glink's requests, but will reduce those requests slightly in response to Jason's own acknowledgment that certain items may have been related to program costs rather than overhead (which would lower Glink's damages). The court's analysis of Jason's report and Glink's actual damages award can be found *infra* at *Part V (Actual Damages Calculations)*.

### IV. Counts Three and Six: Fraud and Breach of Contract with Respect to the Third Agreement

As to the third agreement, Count Three of the Complaint alleges common law fraud and Count Six alleges breach of contract. In addition to the actual damages sought for breach of contract, Glink seeks to recover punitive damages for the fraud count. In Illinois, a plaintiff is entitled to punitive damages for fraud only in gross or extreme cases. Roboserve, Inc. v. Kato Kagaku Co., Ltd., 78 F.3d 266, 276 (7th Cir. 1996) (applying Illinois law, finding punitive damages inappropriate unless there is evidence that defendant actually intended to financially damage plaintiff); Cornell v. Langland, 440 N.E.2d 985, 987 (Ill. Ct. App. 1982) (punitive damages only where conduct is

---

[2] A prima facie case of breach of contract consists of the following elements: (1) that a contract existed between the parties; (2) that the plaintiff substantially performed its obligation under the contract; (3) that the defendant breached the contract; and (4) that the plaintiff was damaged by the breach. Elane v. St. Bernard Hosp., 672 N.E.2d 820, 826 (Ill. Ct. App. 1996).

"intentional, deliberate and outrageous"); Home Sav. & Loan Ass'n of Joliet v. Schneider, 483 N.E.2d 1225, 1228 (Ill. 1985) ("deceit alone cannot support a punitive damages award."). In the present case, the court does not believe the deceit alleged in Glink's complaint amounts to the outrageous conduct contemplated by Illinois law on punitive damages.

Instead, the court will award actual damages under the breach of contract theory in Count Six and finds that the damages awarded under Count Six fully compensate Glink for the misconduct alleged in Count Three. Accordingly, no damages will be awarded under Count Three.

## V. Actual Damages Calculations

The court must determine the amount of actual damage suffered by Glink as a result of Media's breaches of each of the three oral agreements. To aid the court in this endeavor, Glink submits the affidavit and report of an experienced accountant, Mark Jason, who determined the amount that was actually owed to Glink under each of the three agreements breached by Media. Jason's report establishes Media's profits from the three series of programs to total $511,675.53, with Glink's 50% share being $255,837.77. In calculating Media's profit, Jason deducted the direct and indirect program costs—the costs incurred by Media in producing Glink's programs—from the revenues earned by Media in the form of sponsorship and syndication for the programs.

Media's revenues were well established by written agreements, but its expenses are necessarily more difficult to identify. The most important identification problem lies in the proper allocation of certain expenses listed by Jason as overhead expenses. Media argues in its brief that much of its overhead costs were incurred in producing Glink's programs, and that Jason's report improperly fails to deduct any of these costs from the revenues collected by Media. Media does not offer any evidence of specific instances in which overhead costs were attributable to Glink's

programs, and Media's general complaint is rebuffed by Jason:

> Many [overhead costs] are fixed in nature, and/or discretionary, incurred irrespective of specific programs. These are Media's expenses, which would exist whether or not [Glink's] programs were broadcast and must be covered solely by Media's 50% share of net revenues. In fact, many of these expenses were in place prior to any negotiation with [Glink].

Glink's Motion for Default Judgment, Ex. 6 at 3. The court generally agrees with Jason on this point.

However, the court agrees with Media regarding the fourth category of expenses referred to in Jason's report, in addition to the direct program costs, the indirect program costs, and the overhead costs:

> Certain expense accounts may have *a mix* of the above features [of direct program costs, indirect program costs, and overhead costs], but in the absence of sophisticated recordkeeping, fall into overhead, since it is impractical to determine what portion is [indirect program costs,] to be allocated to the programs. Telephone and postage are examples. These accounts *may include a significant amount of both program and non-program related amounts.* Payroll presents a similar problem. Since I found no detail [sic] time records, they were considered Media overhead.

Id. (emphasis added).

The court labels these problematic expenses "mixed" expenses or costs, and Media's objection to bearing all of these costs is well taken. The point is more or less conceded by Jason himself, and while it may be "impractical to determine what portion" should be attributed to Glink's programs, it is unfair to attribute *none* of the mixed costs to Glink's programs. In addition, the court believes that it may be impractical to expect sophisticated recordkeeping for the mixed expenses identified by Jason. Accordingly, the court finds that postage costs, telephone costs, office salaries and payroll taxes will all be partially included in program costs, and therefore will all be partially deducted from revenues in determining profit. This change will lower Jason's calculation of profits

and will therefore lower the actual damages claimed by Glink.

The total cost of postage, telephone, office salaries and payroll taxes reported by Jason for the pertinent time period was $349,859.53 ($15,384.17 for postage; $58,723.65 for telephone; $239,696.63 for office salaries;[3] and $36,055.08 for payroll taxes). In the interest of fairness, the court will attribute 10% of these costs to Glink's programs, reducing the total profit for Glink's programs by $34,985.95—from $511,675.53 to $476,689.58. Glink's 50% share of the profit is thus $238,344.79. The court believes this reduction in Glink's share of profits will adequately reflect the significant portion of mixed expenses that were probably linked to Glink's programs. The court otherwise accepts Jason's report as accurate and reasonably certain. For these reasons, Glink will be awarded **$238,344.79** as actual damages for breach of contract under Counts Four, Five, and Six.

## VI. Counts Seven and Eight: trademark infringement and unfair competition

Glink asks the court to dismiss without prejudice the counts relating to Media's trademark infringement and unfair competition, and Media does not object. Accordingly, Counts Seven and Eight will be dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, defendant Media Adventures, Inc. is ordered to pay to plaintiffs Ilyce Glink and Think Glink, Inc. the following damages: **$64,000** statutory damages and **$21,588.91** attorneys' fees for Count One; **$238,344.79** for actual damages under Counts Four, Five, and Six. Counts 7 and 8 of plaintiffs' complaint are hereby dismissed without prejudice.

---

[3] The court does not include the salary of defendant Saul in the office salaries portion of mixed expenses, because Saul was running Media at the time of the company's misconduct, and even Media does not argue that his salary should be chargeable in any way against Glink's share of profits.

13

ENTER:

*Nan R. Nolan*
Nan R. Nolan
United States Magistrate Judge

Dated: Aug 29, 2000